19-677 (L)
*Donna Browe, et al. v. CTC Corp., et al.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

August Term, 2020

Argued: December 14, 2020     Decided: September 29, 2021

Docket No. 19-677-cv, 19-813-cv

---

DONNA BROWE, TYLER BURGESS, BONNIE JAMIESON, PHILIP JORDAN, ESTATE OF
BEVERLY BURGESS,

*Plaintiffs-Appellants-Cross-Appellees*,

LUCILLE LAUNDERVILLE,

*Plaintiff-Counter-Defendant-*
*Appellant-Cross-Appellee*,

— v. —

CTC CORPORATION, BRUCE LAUMEISTER,

*Defendants-Counter-Claimants-Appellees-*
*Cross-Appellants*.

---

B e f o r e :

LIVINGSTON, *Chief Judge*, LYNCH and BIANCO, *Circuit Judges*.

CERTIFIED COPY ISSUED ON 09/29/2021

_____

Former employees and officers brought this action under the Employee Retirement Income Securities Act ("ERISA") against a defunct photo-finishing company and its former CEO, Bruce Laumeister, alleging various violations and breaches of fiduciary duties with respect to a deferred compensation plan (the "Plan"). Following a bench trial, the United States District Court for the District of Vermont (Reiss, *J.*) entered judgment for Plaintiffs on their fiduciary duty and reporting claims, denied their request for declaratory and injunctive relief, and entered judgment for Defendants on Plaintiffs' wrongful denial of benefits claims. The district court also entered judgment for Defendants on their counterclaim for contribution against Plaintiff Launderville, who was a Plan co-fiduciary, and held her liable for 40% of the award without ordering joint and several liability. The district court calculated damages based on the projected balance of the Plan in 2004 and appointed a special master to distribute the proceeds to former CTC employees on a per capita basis.

After considering the parties' arguments, we hold as follows: (1) the district court correctly rejected Defendants' invocation of ERISA's three-year statute of limitations for fiduciary claims because Defendants failed to prove that all Plaintiffs had knowledge of the breaches more than three years prior to the commencement of this suit; (2) Defendants waived any reliance on ERISA's six-year statute of repose by failing to assert it any time prior to their reply brief before this Court; (3) the Plan is not exempt from ERISA's funding, fiduciary, and vesting requirements because it was not offered to a qualitatively select group of employees; (4) the district court's decision to limit damages on Plaintiffs' fiduciary claims to the Plan's projected balance as of 2004 was error, and damages must be recalculated to reflect the Plan's balance as it would have been had its funds been prudently invested through the date of judgment; (5) it was error for the district court not to assess the scope of CTC's liability, if any, for the claims asserted against it; (6) Laumeister is liable for the entire amount of the restoration award, because liability under ERISA is joint and several; (7) while the district court's conclusion that Launderville is liable in contribution is supported by sufficient evidence, that liability is to Laumeister, not to the Plan; (8) there is no basis to impose liability on Launderville for her failure to comply with ERISA's reporting requirements, as no party with standing sued her for that

failure; (9) the district court's entry of judgment for Defendants on Plaintiffs' wrongful denial of benefits claims was error, though we express no view on the ultimate viability of those claims, which are appropriately assessed by the district court in the first instance; (10) the district court's order that the restoration award be distributed on a per capita basis to Plan participants risks violating those participants' vested rights and is, in any case, inconsistent with ERISA; and (11) Defendants' evidentiary challenge is meritless. We leave the task of crafting a process to assess eligibility for benefits under the Plan and to disburse such benefits to the district court on remand. Accordingly, we AFFIRM IN PART and VACATE IN PART the judgment below and REMAND this case for further proceedings consistent with this opinion.

————————

> JOHN D. STASNY, Woolmington, Campbell, Bent & Stasny, P.C., Manchester Center, VT, *for Plaintiffs-Appellants-Cross-Appellees and Plaintiff-Counter-Defendant-Appellant-Cross-Appellee.*
>
> A. JAY KENLAN, A. Jay Kenlan, Esq., PLLC, Rutland, VT, *for Defendants-Counter-Claimants-Appellees-Cross-Appellants.*

————————

GERARD E. LYNCH, *Circuit Judge*:

Former employees and officers of the now-defunct CTC Corporation brought this action asserting various claims under the Employee Retirement Income Securities Act ("ERISA") against the corporation and its former CEO, Bruce Laumeister, arising out of alleged mismanagement of the firm's deferred compensation plan (the "Plan"). Plaintiffs asserted claims for wrongful denial of

3

benefits, breaches of fiduciary duties, and violation of ERISA's reporting requirements. Plaintiffs also sought a judgment declaring that they were entitled to benefits under the Plan and injunctive relief in the form of the appointment of an administrator for the Plan. Defendants countersued Plaintiff Launderville for contribution and indemnity. After a bench trial, the United States District Court for the District of Vermont (Christina C. Reiss, *J.*) entered judgment for Plaintiffs on their fiduciary duty and reporting claims and judgment for Defendants on the remaining claims. The district court also entered judgment against Plaintiff Launderville on Defendants' contribution claim.

In a subsequent remedial opinion, the district court calculated the damages on the fiduciary breach claims at $350,603 and appointed a special master to administer the distribution of the award on a per capita basis to those Plan participants who met certain qualifications. The district court further apportioned liability for the award between Laumeister and Launderville at 60% and 40%, respectively, without holding them jointly and severally liable, and ordered each to pay $1,000 in damages for the reporting claims.

The parties cross appealed. Plaintiffs assert that the district court's limitation of damages to the Plan's projected balance as of 2004 violates ERISA by

4

failing to restore all Plan losses, and that the per-capita distribution scheme that the district court adopted violates their vested rights to benefits. Plaintiffs also argue that the district court erred in holding Launderville liable, and that CTC itself is jointly and severally liable for the losses. Finally, Plaintiffs contend that the district court erroneously dismissed their wrongful denial of benefits claims and that their benefits are vested and enforceable. Defendants argue that the claims are time-barred and, in any case, meritless because the Plan was exempt from the relevant provisions of ERISA as a "top hat" plan. Defendants also assert that the district court erred in admitting a 1997 statement of account balances because it was hearsay not falling within any exception to the general rule excluding hearsay evidence.

For the most part, we agree with Plaintiffs. Accordingly, for the reasons stated below, we hold as follows: (1) the district court correctly rejected Defendants' invocation of ERISA's three-year statute of limitations for fiduciary claims because Defendants failed to prove that all Plaintiffs had knowledge of the breaches three years prior to the commencement of this suit; (2) Defendants waived any reliance on ERISA's six-year statute of repose by failing to assert it; (3) the Plan was not a top hat plan because it was not offered to a qualitatively

select group of employees; (4) the district court's decision to limit the restoration

award to the Plan's projected balance as of 2004 was error, and damages must be

recalculated to represent the Plan's balance had its funds been prudently

invested through the date of judgment; (5) it was error for the district court not to

assess the scope of CTC's liability, if any, for the claims asserted against it;

(6) Laumeister is liable for the entire amount of the restoration award, as liability

under ERISA is joint and several; (7) while the district court's conclusion that

Launderville is liable in contribution is supported by sufficient evidence, that

liability is to Laumeister, not to the Plan directly; (8) there is no basis to impose

liability on Launderville for her failure to comply with ERISA's reporting

requirements, as no party with standing sued her for that failure; (9) the district

court's entry of judgment for Defendants on Plaintiffs' wrongful denial of

benefits claims was error, though we express no view on the ultimate viability of

those claims, which are appropriately assessed by the district court in the first

instance; (10) the district court's order that the restoration award be distributed

on a per capita basis to Plan participants risks violating those participants' vested

rights and is, in any case, inconsistent with ERISA; and (11) Defendants'

evidentiary challenge is meritless.

We therefore AFFIRM IN PART and VACATE IN PART the judgment of the district court and REMAND this case for further proceedings consistent with this opinion. We DENY all pending motions as moot.

## BACKGROUND

### I.    Factual Background

Except as otherwise noted, the following statement of facts paraphrases the district court's extensive findings. Because neither party argues that those findings are clearly erroneous, we accept them as true for the purpose of this opinion.

Defendant-Counter-Plaintiff-Cross-Appellant Bruce Laumeister formed Defendant-Counter-Plaintiff-Cross-Appellant the CTC Corporation ("CTC") in or around 1979. Laumeister was CTC's sole shareholder, Chief Executive Officer, and the chairman of its board of directors throughout CTC's existence. He served as president of CTC from 1979-2000 and then from 2008 until its dissolution in 2014. From around 1979 until 2014, CTC operated a retail photo-finishing facility and retail store in Bennington, Vermont. CTC also operated between 23 and 26 one-hour photo labs in Vermont, Connecticut, Massachusetts, New Hampshire,

7

and New York (the "One-Hour Labs"). The One-Hour labs also operated as retail stores selling photographic equipment and supplies.

The One-Hour Labs were incorporated in the states in which they conducted business, filed their own tax returns, and paid their employees through three corporations, each of which held a separate bank account controlled by CTC: VSL Corp. (New Hampshire); LWB Corp. (Massachusetts); and BRL Corp. (Vermont and New York). The ownership structure of those corporations was not clearly established in the record; while Laumeister testified that they were wholly owned subsidiaries of CTC, he admitted on cross-examination that LWB was not a wholly owned subsidiary but was instead owned by Laumeister and a man named Christopher Belknap.

Between 1980 and 2000, CTC grew significantly. At its peak operation, CTC's Bennington facility operated three and sometimes four shifts per day, depending on the seasonal volume of the film to be developed and printed. During peak times, CTC and One-Hour Labs employed additional workers, typically on a part-time basis. Although Defendants assert that CTC employed 196 people at its peak, that figure includes employees of the One-Hour Labs. The

district court found that CTC itself had no more than 60 full-time employees as of 1997.

Many of the Plaintiffs began their careers at CTC at or around its inception. Donna Browe was employed by CTC from its inception until on or about November 12, 2012. Browe began at CTC as a "minimum-wage" clerk in the accounting department and eventually rose to manager of the department in 2000. Browe voluntarily left her job at CTC in 2012 for a position at Morris Repair Company. Lucille Launderville also began her employment with CTC at its inception. Launderville initially worked in customer service but was eventually promoted to a number of senior positions, including President and Chief Operating Officer. Launderville also came to hold a position on the company's board. She resigned from CTC in 2008 for a position at Plasan Industries. Beverly Burgess, who died in November 2004, was employed by CTC from the time of its formation in 1980 until approximately 2004. She is the mother of Plaintiffs Tyler Burgess and Bonnie Jamieson. Philip Jordan worked at CTC from its inception until January 4, 2008, excluding the period between October 1986 and October 1988. Jordan began as a salesman and eventually became sales manager.

9

Sometime in late 1989 or early 1990, due to the company's rapid growth and success, CTC decided to offer certain employees a deferred compensation plan (the "Plan"). Wayne Massari, who served as CTC's Treasurer and Chief Financial Officer and sat on CTC's board until he suffered a stroke and became permanently disabled in 1999, drafted the first plan agreement, dated December 10, 1990 (the "1990 Plan Agreement").[1]

---

[1] Parts of the district court's decision suggest that it may have concluded that there were two different deferred compensation plans, one offered in 1990 and the other in 1997. That, however, is inconsistent with the record. In 1997, CTC drafted a new plan *agreement*. While that agreement, discussed *infra*, contains some terms different from those of the 1990 Plan Agreement, nothing in the record suggests that it was CTC's intent to terminate the existing plan and institute a new one, as opposed to simply amending the existing plan. To the contrary, Laumeister testified that "there are two written plan agreements governing the deferred compensation that is the subject of this lawsuit," 12/6/2017 Tr. at 19:22-24, and that "CTC offered . . . its employees an amended deferred compensation plan agreement in 1997," *id.* at 22:7-10.

The parties' conduct is also inconsistent with the notion that CTC terminated the existing deferred compensation plan in 1997; setting aside what ERISA would require had the Plan terminated, under the terms of the 1990 Plan Agreement, termination of the Plan would have required CTC to pay out each participant's account, which plainly did not happen. Instead, it appears that participants who joined the Plan prior to the 1997 amendment continued their participation in the normal course after signing an amended application. Accordingly, we conclude that CTC offered one deferred compensation plan, the Plan, governed by an agreement written in 1990 and amended in 1997. *Cf. Dink v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 811 (7th Cir. 1994) ("A plan need not be in writing . . . so long as the plan is a reality, meaning something more than a mere decision to extend benefits.").

10

Laumeister intended the Plan to accomplish three objectives: (1) to reward CTC's senior managers for the performance and growth of the company; (2) to incentivize CTC's senior managers to remain as employees of CTC until their retirement at age 65 or their death or disability while in CTC's employ; and (3) to encourage CTC's senior managers to make annual contributions of a minimum of three percent of their salary to their own Individual Retirement Accounts. Moreover, Laumeister intended the Plan to be a "top hat" plan that was offered to a select group of highly compensated managerial employees within the meaning of ERISA.[2] However, the 1990 Plan Agreement did not state that it was a "top hat" plan or a "non-qualified plan,"[3] and it did not refer to ERISA. Moreover, as explained below, the Plan covered whatever employees Laumeister chose to include, regardless of their duties, job titles, or compensation levels.

To fund the Plan, CTC established accounts with the Massachusetts

---

[2] As discussed in greater detail below, ERISA exempts plans that are unfunded and offered to a select highly compensated group of managerial employees from several of its provisions, including its fiduciary, vesting, and funding requirements. Such plans are colloquially known as "top hat" plans.

[3] A "non-qualified plan" is an employee benefit or retirement plan that is exempted from ERISA's funding, fiduciary, and other requirements. That category includes, but is not limited to, top hat plans.

11

Mutual Life Insurance Company ("MassMutual"), into which it deposited funds

from which it intended to pay deferred compensation. Although the district court

made no specific findings on this point, there appears to be no dispute that CTC

regularly deposited funds into the Plan account until it began to experience

financial difficulties. Under the 1990 Plan Agreement, participants were required

to agree "to provide evidence, by way of direct payroll deduction or other, that a

minimum of 3% of their salary is deposited into an individual retirement

account. This allocation must continue for each year the employee is a participant

in this Plan." J. App'x at 333. The 1990 Plan Agreement does not, however,

provide for any consequence for a participant's failure to fulfill that requirement.

By 1997, Laumeister was dissatisfied with the investment returns

generated by the MassMutual accounts. As a result, CTC terminated its

relationship with MassMutual and issued a new plan agreement (the "1997 Plan

Agreement"), dated August 20, 1997. By no later than 2003, CTC had opened an

account with Mission Management & Trust, which held Plan funds for the

remainder of the Plan's existence.

Massari drafted the 1997 Plan Agreement, which, like the 1990 Plan

Agreement, does not state that it is a "top hat" plan, does not indicate that it is

12

"non-qualified," and contains no reference to ERISA. The 1997 Plan Agreement

continued the requirement that participants provide evidence of having

deposited 3% of their income into an IRA and further provides that "[i]n the

event that a Participant fails to continue funding the IRA, pursuant to this

agreement, the Employer will terminate funding the plan on behalf of the

Participant and all benefits accrued will be forfeited to the Employer. The

Employer will notify the Participant in writing thirty days prior to termination."

J. App'x at 379.

Both the 1990 and 1997 Plan Agreements state, in relevant part, that they

are intended to provide an "employer paid fund," to which CTC "agrees to

contribute funds which will . . . be payable in accordance with Section 6" thereof.

J. App'x at 374-75, 378-79. Section 6 of both agreements provides that funds will

be payable upon the retirement, defined as "withdrawal from full time active

employment at or after age 65," *id.* at 374, 378, or death of the participant (in the

latter case, with funds being paid to the participant's designated beneficiary on

one of several schedules at CTC's election).

Each employee to whom the Plan was offered signed an application to

participate.[4] The application to participate under the 1997 Plan Agreement

provides that the applicant "understand[s] that the company funding of this plan

is contingent upon my annual contribution of a minimum of 3% of my base

salary to my personal individual retirement account for each year I participate in

the plan." J. App'x at 344.

The district court determined that CTC invited eighteen employees to

participate in the Plan, seventeen of whom could be identified: (1) Wayne

Massari; (2) Lucille Launderville; (3) Donna Browe; (4) Philip Jordan; (5) Beverly

Burgess; (6) Sharon Fish; (7) Hope Leonard; (8) William Elliott; (9) Don Hollner;

(10) Eileen Bliss; (11) Ed Hojnowski; (12) Robin Secord; (13) Steven Brown;

(14) Garry Pleasant; (15) Donald Loseby; (16) Sue Carman or Caraman; and

(17) Pat DeCoff. All of these employees worked for CTC in Vermont; there is no

evidence that any employee of the One-Hour Labs or any other affiliate was

offered an opportunity to participate. These employees varied widely in terms of

---

[4] It is unclear whether participants signed applications to participate in the Plan when it was governed by the 1990 Plan Agreement. Jordan testified to having signed an application sometime between the mid-80s and early 90s and did not recall signing an application in 1997. *See* 12/7/2017 Tr. at 119-20. Launderville testified that she "definitely" signed applications in both 1990 and 1997. 12/8/2017 Tr. at 9-10**.** However, the district court made no findings on this issue, and no pre-1997 application is in the record.

14

how much they were compensated and their level of managerial responsibility.
Massari and Launderville, for example, had significant responsibilities within
CTC and high salaries. On the other hand, Ed Hojnowski "fixed machines, was
not a 'boss,' and never gave any orders." *Browe v. CTC Corp.* (*Browe I*), 331 F.
Supp. 3d 263, 287 (D. Vt. 2018). Ultimately, the district court concluded that there
was insufficient evidence that six of the eighteen employees who were invited to
participate in the Plan were either highly compensated or managerial employees.

CTC, at least until Massari's departure in 1999, periodically provided the
Plan participants with account statements showing the amounts held in the Plan.
However, neither Plaintiffs nor Defendants retained copies of Plan statements
with the exception of one "worksheet" retained by Launderville, which the
district court admitted into evidence over Defendants' objections as Plaintiffs'
Exhibit 3, and two documents retained by Laumeister. Launderville testified that
Massari prepared the worksheet and gave it to her at some point in 1997, and the
parties agreed that preparing Plan documents was within the scope of Massari's
duties at CTC. The worksheet indicated a plan balance of $261,368.14 as of March
18, 1997, and total CTC funding for each individual Plaintiff as follows: (1) Lucille
Launderville: $40,104.75; (2) Donna Browe: $15,611.14; (3) Beverly Burgess:

15

$19,906.23; and (4) Phil Jordan: $17,417.30. The district court found the worksheet to be reliable for the following purposes: (1) to establish that Laumeister was the primary decision-maker with regard to the Plan; (2) to reflect account balances adjusted to reflect the Plan account's actual balance as of March 18, 1997; and (3) to confirm that it was a document generated by Massari to project how the Plan might perform under certain assumptions (several of which were inconsistent with the actual terms of the Plan Agreements). It does not appear from the record that CTC maintained separate accounts for each Plan participant, but the worksheet suggests that the company maintained records earmarking funds in the Plan account for each participant.

Between 1990 and 2014, CTC paid deferred compensation under the terms of the Plan to four Plan participants: (1) Don Loseby, (2) Hope Leonard, (3) Eileen Bliss, and (4) Wayne Massari. In addition, Sharon Fish and William Elliott were permitted to retire early and received Plan benefits, notwithstanding the Plan Agreement's limitation of eligibility to employees' reaching age 65, dying, or becoming disabled.

Beginning in the early 2000s, CTC experienced a significant decline in sales due to the advent of digital photography and internet photo-finishing services.

16

Beginning in 2004 and continuing every year until its dissolution, CTC's operating expenses exceeded its revenue. In 2004, Laumeister told Launderville "that because of the deteriorating financial condition of CTC, the [P]lan was being terminated and the funds would be used to pay business operating expenses." *Browe I*, 331 F. Supp. 3d at 281 (alteration in original). However, CTC, Laumeister, and Launderville did not "otherwise announce[] the termination of the [] Plan." *Id.*

From that point on, Browe and Launderville periodically advised Laumeister of the extent of CTC's operating shortfalls, and Laumeister directed withdrawals from the Plan account to cover them. When CTC's cash reserves were exhausted, Laumeister made a series of personal loans to CTC to cover its operating expenses; by 2014, CTC owed Laumeister approximately $600,000. In or around 2006, Laumeister convened a meeting attended by Launderville and other employees in which he explained that CTC was in financial distress and asked employees to accept a twenty percent salary reduction.

By February 2008, the only remaining employees of CTC who were Plan participants were Browe and Launderville. By this point, CTC's cash flow was insufficient to pay its general creditors or to fund its deferred compensation

accounts. In 2014, at Laumeister's direction, CTC ceased doing business and filed

Articles of Dissolution with the Vermont Secretary of State. At some point

thereafter, Laumeister ordered that CTC's business records be destroyed.[5]

Both Browe and Launderville maintained contact with Laumeister and

sought to recover their deferred compensation from him. In 2010, Laumeister

amended his will to include bequests for Browe and Launderville, which he

increased in 2014. In 2015, Launderville advised Laumeister that she "will be

pushed into retirement about a year or so sooner than anticipated" and asked

him to "take care of the commitment which was made so many years ago" in the

form of her deferred compensation account. J. App'x at 347. This suit followed

later that year.

## II.  Procedural History

Plaintiffs asserted six claims under ERISA for various breaches of fiduciary

duties, violation of ERISA's reporting requirements, and wrongful denial of

---

[5] As a result, a full financial reconstruction is not possible. We note, however, that the district court did not find that this destruction of records justified an adverse inference or was intended to hide any wrongdoing. Rather it found that "the true impetus for their destruction was Mr. Laumeister's desire not to leave them behind in the Bennington facility[,] for which CTC had not paid its property taxes." *Browe I*, 331 F. Supp. 2d at 282. Plaintiffs do not suggest that this finding was clearly erroneous.

benefits. Plaintiffs also sought an injunction appointing a new administrator for the Plan and a declaration of their entitlement to future benefits.

Defendants admitted they appropriated the 1997 Plan's assets to fund CTC's operating costs but denied liability, arguing that the Plan was a "top hat" plan under ERISA and was therefore exempt from its funding, vesting, and fiduciary liability provisions. *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1). Defendants also asserted that the fiduciary claims were time-barred under ERISA's three-year limitations period and countersued Launderville for contribution on the theory that, should the district court determine that the Plan was not a top hat plan and that the claims were not time-barred, she was liable as a co-fiduciary.

After a five-day bench trial, the district court concluded that the 1997 Plan was not a top hat plan because it was not offered to a quantitatively or qualitatively select group of CTC employees. *Browe I*, 331 F. Supp. 3d at 301. The district court thus entered judgment for Plaintiffs on their fiduciary duty claims, which were premised on Defendants' withholding of Plan assets and using them for CTC's benefit, operating a plan that failed to comply with ERISA, and self dealing, and rejected Defendants' assertion that those claims were barred by

19

ERISA's three-year statute of limitations. *Id.* at 305-310. The district court further entered judgment for Plaintiffs on their reporting claims, and entered judgment against Launderville on this claim as well. *Id.* at 311.

However, the district court entered judgment for Defendants on Plaintiffs' wrongful denial of benefits claims as well as on their corresponding claim for a declaratory judgment of their future entitlement to benefits, reasoning that, with the exception of Bonnie Jamieson, who died in 2004, Plaintiffs had not "retired at sixty-five, died, or become disabled while in CTC's employment and they have not proffered evidence that they complied with the 1997 Plan's 3% contribution requirement." *Id.* at 304. The district court separately held that Burgess and Jamieson had not proved their entitlement to benefits as beneficiaries of their mother because "[t]hey proffer no evidence of their mother's application to participate in the 1997 Plan, no evidence that their mother retained any Plan documents, and no evidence that she entered into an agreement with CTC regarding how death benefits would be paid." *Id.* The district court declined to award specific relief at that time and instead ordered supplemental briefing on appropriate remedies.

In a subsequent remedial opinion, the district court rejected Plaintiffs'

20

assertion that ERISA required restoration of Plan losses through judgment and instead awarded $350,603 to be restored to the Plan. *See Browe v. CTC Corp.* (*Browe II*), No. 15-cv-267, 2018 WL 5095677, at *6 (D. Vt. Oct. 18, 2018). That figure represented the court's assessment of the Plan's 2004 year-end balance had the funds in the Plan account as of March 18, 1997 been prudently invested. Although it was undisputed that CTC continued contributing to the Plan account after 1997, the district court determined that it could not estimate the amount of such contributions with sufficient confidence to include them in its calculation of damages and therefore declined to do so. Plaintiffs do not challenge this determination on appeal and instead seek damages based only on the 1997 balance of the Plan account.

The district court also held Launderville liable for contribution. To reflect what it assessed as her and Laumeister's relative fault, the district court held Laumeister and Launderville responsible for 60% and 40% of the award, respectively, to be paid directly to the Plan and without joint and several liability. *Id.* at *8-12. The district court did not separately assess liability against CTC.

Having already concluded that no Plaintiff had demonstrated entitlement to Plan benefits, the district court ordered that proceeds of the restoration award

21

be distributed to all Plan participants on a per capita basis provided they met

certain criteria. *Id.* at *6-7. Specifically, to receive her share of the award, a

participant would have to prove that she was vested in the Plan by submitting a

sworn statement that: (1) she was a participant, (2) she worked for CTC for at

least six years after March 18, 1997, and (3) she had reached age 65 (or the date on

which she would). *Id.* at *8. Finally, the district court ordered Laumeister and

Launderville to pay damages of $1,000 each for violating ERISA's reporting

requirements. *Id.* at *12-13. This appeal followed.

## DISCUSSION

Because the parties challenge the district court's conclusions of law, rather

than its findings of fact, we review all issues presented de novo, *see LoPresti v.*

*Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997), except for Defendants' evidentiary

challenge, which we review for abuse of discretion. *See, e.g.*, *Retirement Plan of*

*UNITE HERE Nat'l Retirement Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 287

(2d Cir. 2010).

## I.    Statutes of Limitations and Repose

Defendants argue that Plaintiffs' claims for breaches of fiduciary duties are

barred by ERISA's three-year statute of limitations and six-year statute of repose

22

and should therefore be dismissed. Considering the difficulties that the passage

of time has imposed on the adjudication of this case, many of the precise sort

against which statutes of limitations and repose are intended to guard, we are

sympathetic to Defendants' arguments. Indeed, properly presented and proven,

those arguments might have been successful. On this record, however, we

conclude that Defendants have waived any reliance on the statute of repose, and

that the district court appropriately rejected their invocation of the statute of

limitations.

> ERISA provides, in relevant part, that:

>> No action may be commenced . . . with respect to a
>> fiduciary's breach of any responsibility, duty, or
>> obligation . . . after the earlier of—

>> (1) six years after (A) the date of the last action which
>> constituted a part of the breach or violation, or (B) in the
>> case of an omission the latest date on which the
>> fiduciary could have cured the breach or violation, or
>> (2) three years after the earliest date on which the
>> plaintiff had actual knowledge of the breach or
>> violation[.]

29 U.S.C. § 1113. As the Supreme Court recently reaffirmed, § 1113(1)'s six-year

limitations period is a statute of repose that begins running either on the date of

the last action constituting a breach or the last date on which any omission could

have been remedied, as applicable, irrespective of whether the injured party knows of the conduct or injury. *See Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 774 (2020). In contrast, § 1113(2)'s three-year limitations period is a traditional statute of limitations that begins running upon a plaintiff's acquisition of "actual knowledge" of the breach. *See generally id.* As we have previously held, a "statute of limitations argument is an affirmative defense for which [the defendant] bears the burden of proof." *United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013). A statute of repose, in contrast, "is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit." *P. Stolz Fam. P'ship v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004).

At the outset, we note that Defendants did not raise the six-year statute of repose before the district court. Nor did they invoke it in their opening brief on appeal. Instead, as far as we can discern, this argument makes its first appearance in Defendants' reply brief before this Court. While statutes of repose differ from statutes of limitations in several key respects, most notably in that they are mandatory and not subject to equitable exceptions, *see id.*, statutes of limitations and repose are both non-jurisdictional claims-processing rules, *see Sec'y, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883-88 (11th Cir. 2017) (holding that

24

ERISA's statute of repose is non-jurisdictional). And "an objection based on a mandatory claims-processing rule may be forfeited if the party asserting it waits too long to raise the point." *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019) (internal quotation marks omitted).

Defendants waited too long to raise their objection under the statute of repose. Even setting aside the fact that they did not invoke the statute of repose at any point during the proceedings below, which itself is more than sufficient to deem the issue forfeited, it is hornbook law that "[a]rguments may not be made for the first time in a reply brief." *Knipe v. Skinner*, 999 F.2d 708, 710-11 (2d Cir. 1993) (collecting cases). Thus, though the statute of repose may well have resolved the fiduciary duty claims had it been properly interposed, we hold that Defendants forfeited their objection and we therefore decline to consider it further.

That leaves Defendants' argument under the three-year limitations period, which all parties agree is properly before this Court. As discussed above, a cause of action for breach of fiduciary duties under ERISA accrues when the injured party acquires actual knowledge of the facts underlying the breach. "[A] plaintiff has actual knowledge of the breach or violation within the meaning of [§ 1113(2)]

25

when he has knowledge of all material facts necessary to understand that an

ERISA fiduciary has breached his or her duty or otherwise violated the Act."

*Caputo v. Pfizer, Inc.* 267 F.3d 181, 193 (2d Cir. 2001). The term "actual knowledge

is strictly construed and constructive knowledge will not suffice." *L.I. Head Start*

*Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau County*, 710 F.3d 57, 67 (2d

Cir. 2013), citing *Caputo*, 267 F.3d at 193-94. Actual knowledge, however, does not

include knowledge of the underlying law. *See id.*; *see also Muehlgay v. Citigroup,*

*Inc.*, 649 F. App'x 110, 111 (2d Cir. 2016).

Defendants argue that several Plaintiffs had actual knowledge of the

breaches underlying the claim well over three years before this action was filed in

2015. True though that may be, § 1113(2) bars a suit brought more than "three

years after the earliest date on which *the plaintiff* had actual knowledge of the

breach or violation." 29 U.S.C. § 1113(2) (emphasis added). Thus, a plaintiff who

did not have such knowledge more than three years before bringing suit cannot

be time-barred because some *other* plaintiff (or potential plaintiff) had learned of

the breach at an earlier time. That makes sense because, as the district court

correctly pointed out (and as Defendants do not challenge on appeal), Plaintiffs'

fiduciary duty claims were brought in a representative capacity, on behalf of the

Plan itself.[6] An individual participant's failure to act in a timely way on her

knowledge of a fiduciary breach may prevent her from bringing suit but does not

forever foreclose others from vindicating the rights of all who are affected by the

breach. Thus, as the Ninth Circuit held, no other participant's actual knowledge

of a fiduciary breach can be imputed to a plaintiff who lacked such knowledge.

*See Landwehr v. DuPree*, 72 F.3d 726, 732-33 (9th Cir. 1995).

Accordingly, failure of proof as to any individual plaintiff's actual

knowledge is sufficient to defeat Defendants' statute of limitations argument. Put

another way, it was not enough for Defendants to prove that the limitations

period had run as to *some* Plaintiffs prior to the filing of this suit; rather,

---

[6] Fiduciary breach claims under ERISA "may not be made for individual relief, but instead are brought in a representative capacity on behalf of the plan." *L.I. Head Start*, 710 F.3d at 65 (internal quotation marks omitted). ERISA's civil enforcement provisions empower three classes of individuals to bring such claims: participants, beneficiaries, and fiduciaries. *See* 29 U.S.C. § 1132(a)(2). There is no specific set of procedural steps that a prospective plaintiff must take in order to proceed in a representative capacity; she must only "take adequate steps under the circumstances properly to act in" that capacity. *Coan v. Kaufman*, 457 F.3d 250, 261 (2d Cir. 2006). As noted, the district court concluded that Plaintiffs took sufficient steps to act on behalf of the Plan. Because each Plaintiff has an independent right of action to pursue claims on behalf of the Plan, the statute of limitations must be analyzed separately as to each of them. *See* 29 U.S.C. § 1113(2) (fiduciary claims must be brought by "three years after the earliest date on which *the plaintiff* had actual knowledge of the breach or violation") (emphasis added).

Defendants had to prove that *all* Plaintiffs acquired "actual knowledge" of the breaches outside the limitations period for the defense to succeed. On this record, we conclude that they did not.

We agree with Defendants that Launderville and Browe had knowledge of the fiduciary breaches underlying the claims. That conclusion flows directly from the district court's finding that both of them were actually aware of Laumeister's misappropriation of Plan assets. Moreover, Plaintiffs themselves alleged that "Laumeister admitted to Launderville that he had been using Plan assets to pay for CTC's business expenses." J. App'x at 63.[7] Thus, Browe's and Launderville's fiduciary claims are, as a formal matter, time-barred, and they would not have been able to bring those claims if they were the only Plaintiffs.[8]

─────────────

[7] Whether a participant in a plan presented as a top hat plan must also have knowledge of facts sufficient to understand that the plan at issue is actually subject to ERISA's fiduciary requirements is, as far as we are aware, a question of first impression. Though Launderville was aware of the identity of employees who were invited to participate, it is unclear whether the same can be said of Browe. Because, however, Defendants failed to prove that the remaining Plaintiffs had actual knowledge of Laumeister's misappropriation of Plan funds and self-dealing, which form the core of the fiduciary claims, we need not resolve that question to decide this case and, accordingly, decline to do so.

[8] It may therefore be appropriate for the district court, on remand, to dismiss Browe and Launderville as plaintiffs with respect to the breach of fiduciary duty claim. Because, as we conclude below, other plaintiffs can bring that claim

We cannot, however, say the same for the remaining individual Plaintiffs. As to Bonnie Jamieson and Tyler Burgess, there is no evidence in the record that either knew anything about Laumeister's "termination" of the Plan in 2004 and his subsequent use of the deferred compensation funds for CTC's operating expenses. Burgess testified that he neither knew nor heard anything about the Plan's existence prior to 2015, and Defendants point to no evidence suggesting otherwise. Although Jamieson testified that her mother (Beverly Burgess) told her about the CTC deferred compensation plan "probably in the 1980s," *id.* at 205, there is no evidence that Jamieson saw any Plan documents or learned anything else about the Plan or its administration before her mother's death in 2004. *Id.* at 205-06. After her mother's death, Jamieson, as executor of her mother's estate, asked Launderville whether anything was "available from [Beverly Burgess's] retirement plan," and was told that "[t]here was nothing available." *Id.* at 206. But there was no evidence that Jamieson ever learned of the Plan's terms or that its assets had been misappropriated prior to the filing of this suit. Thus, Defendants failed to prove that either Jameison or Burgess had actual knowledge

---

without running afoul of the statute of limitations, such a dismissal would have no practical effect on the ultimate success of Defendants' statute of limitations defense to liability on the fiduciary claims.

of the breaches more than three years prior to the commencement of this case.

Jordan likewise testified that he was never told at any point prior to 2015 that Laumeister and Launderville had ostensibly terminated the Plan and were using its funds to cover CTC's operating expenses. Further, he specifically testified that the deferred compensation plan was *not* discussed at a 2006 meeting during which Laumeister told CTC's employees that the company was in financial distress and proposed that employees take a 20% cut to their salaries. Defendants proffered no evidence contradicting that testimony, and the district court did not find that the Plan was discussed during that meeting.[9] *See Browe I*, 331 F. Supp. 3d at 281. To the contrary, it found that CTC, Laumeister, and

_____

[9] Although oddly omitted from the joint appendix and not referenced in Defendants' arguments, we observe that *Plaintiffs* adduced testimony from another witness that was inconsistent with Jordan's testimony about this meeting and, if believed, may have been sufficient to sustain the defense as against Jordan. Specifically, Launderville testified that Laumeister told employees present at the 2006 meeting that "deferred compensation money was being used" to keep the company afloat. 12/8/2017 Trial Tr. at 11:4-13. The district court's findings of fact, however, tracked Jordan's testimony that the Plan was not discussed at the meeting. *See Browe I*, 331 F. Supp. 3d at 281 ("In approximately 2006, Mr. Laumeister convened a meeting . . . during which he explained that CTC was in financial distress . . . [and] proposed that employees accept a twenty percent pay-cut."). Defendants do not argue that this finding was clearly erroneous (or even mention it in their briefing) and we therefore decline to consider the issue.

30

Launderville did not announce the termination of the Plan. *Id.* Thus, Defendants

likewise failed to establish that Jordan had actual knowledge of the breaches

more than three years prior to the filing of this suit.

Because Defendants failed to establish that three of the Plaintiffs had actual

knowledge of the fiduciary breaches more than three years prior to the filing of

this case, the district court properly rejected their defense under ERISA's three-

year limitations period.[10]

## II.  Top Hat Status

Defendants argue that the Plan was a "top hat plan" within the meaning of

ERISA and therefore exempt from many of ERISA's substantive provisions, and

that the district court erred in concluding otherwise. We agree with the district

court.

"ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and 1101, state

---

[10] As the Ninth Circuit noted in a similar case, one can conceive of cases in which a party with knowledge of a fiduciary breach could manipulate the statute of limitations, for example by withholding their knowledge from other participants in order to prolong the limitations period. *Landwehr*, 72 F.3d at 733 & n.2. Defendants have not argued that Browe and Launderville failed to disclose Laumeister's fiduciary breach for such a manipulative purpose, and the district court made no such finding. We therefore have no occasion to consider here the potential effect of such a manipulation, and, like the Ninth Circuit, *id.* at 733 n.2, we reserve the question for a future case presenting such facts.

that ERISA shall apply to any employee benefit plan, other than listed

exceptions." *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir.

2000). One such exception exists for plans that are "unfunded and [] maintained

by an employer primarily for the purpose of providing deferred compensation

for a select group of management or highly compensated employees." *Id.* at 287,

quoting 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Such plans are commonly

referred to as "top hat" plans. "Top hat plans are exempt from the participation

and vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding provisions,

29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C.

§§ 1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C.

§§ 1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§ 1131-

1145." *Id.*

Following the statutory language, we assess top hat status based on

whether the plan at issue is: "(1) unfunded, and (2) maintained primarily for a

select group of management or highly compensated employees." *Id.*[11]

As a threshold issue, we note that the district court held that defendants

---

[11] Because Plaintiffs do not challenge the district court's conclusion that the Plan
was unfunded, we assume without deciding that it was unfunded for the
purpose of our analysis.

bore the burden of establishing that the plan was a top hat plan. *See Browe I*, 331 F. Supp. 3d at 294-95. We have yet to address this issue, and, as the district court recognized, the circuits to consider it have reached conflicting results. *Compare Daft v. Advest, Inc.*, 658 F.3d 583, 596-97 (6th Cir. 2011) (observing that "the defendant-employer typically advocates for the top-hat status of an ERISA plan in order to avoid statutory liability, and therefore the defendant-employer bears the burden of proof on this issue in the district court"), *with Sikora v. UPMC*, 876 F.3d 110, 113 (3d Cir. 2017) (finding that the Plaintiff "has the burden of showing that the Plan is not a top-hat plan to obtain relief under ERISA"). The parties do not contest the district court's allocation of this burden to Defendants and we therefore assume, without deciding, that its decision to do so was proper.[12]

We have previously explained that, in assessing whether a plan is offered to a "select group of management or highly compensated employees" within the meaning of ERISA, the district court must "conduct a fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction." *Demery*, 216 F.3d at 288, citing *Duggan v. Hobbs*, 99 F.3d 307, 312 (9th Cir. 1996). Quantitatively,

---

[12] In any event, our conclusion that the Plan is not a top hat plan would not change if the burden were allocated to Plaintiffs.

33

"the plan must cover relatively few employees." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996). "While plans offered to a very small percentage of an employer's workforce *often* qualify as top hat plans, there is no existing authority that establishes when a plan is too large to be deemed 'select.'" *Demery*, 216 F.3d at 288 (emphasis added), citing *Duggan*, 99 F.3d at 312. Qualitatively, the "plan must cover only high level employees." *In re New Valley Corp.*, 89 F.3d at 148. Whether a group is "select" is assessed based on the totality of the circumstances, and does not lend itself to neat formulations.

Defendants contest the district court's calculation of the total number of CTC employees for the purpose of assessing the quantitative prong of the analysis, arguing that the district court should have included the employees of the corporations that ran the One-Hour Labs and other parts of the business instead of considering only those employed by CTC directly. In making this argument, Defendants primarily rely on the Internal Revenue Code's definition of a "controlled group," 26 U.S.C. § 1563. Setting aside the fact that Defendants' recitation of the ownership structure of the One-Hour Labs that purportedly brings them within that definition relies on testimony that the district court specifically rejected, Defendants proffer no reason why that definition should

have any bearing on our analysis. The relevant provisions of ERISA do not cross-reference or otherwise incorporate the Internal Revenue Code's definition of a "controlled group" (or, for that matter, use the term "controlled group"), and no court of which we are aware has relied on that definition in this context. In other words, it would be of no moment even if the One-Hour Labs were part of a "controlled group" under the Internal Revenue Code – and the district court found that they were not.

In any case, we agree with the district court that there is no reason to include the One-Hour Labs' employees in assessing the percentage of CTC's workforce that was invited to participate in the Plan. The One-Hour Labs constituted separate entities with separate payrolls that operated separate businesses. Further, there is no evidence that any employee of the One-Hour Labs – of any level of seniority or compensation – was considered for Plan participation. Nor is it the case that CTC was structured such that only high-level employees of the enterprise worked directly for it; the array of CTC employees invited to participate in the Plan ran the gamut from hourly store clerks to senior managers.

Thus, quantitatively, we conclude that 30% of CTC's employees (18 of 60)

35

were invited to participate in the Plan. While this is a considerable percentage of the overall workforce, we have never conclusively delineated when a group is too large to be considered quantitatively select. *But see Demery*, 216 F.3d at 289 (15.34% of workforce "is probably at or near the upper limit of the acceptable size for a 'select group'"). Further, the percentage of the workforce permitted to participate must be considered with reference to the size of the corporation; CTC had only 60 employees, and one could plausibly imagine a corporation of that size in which roughly 30% of the employees hold sufficiently managerial positions so as to render the group comprising them "select" within the meaning of ERISA.

While we are therefore reluctant to hold that the sheer number of employees included in the Plan *categorically* disqualifies it from "top hat" status, the size of the Plan certainly does not weigh in favor of that status. Considered in the light most generous to Defendants, the factor is, at best, neutral.

However, the group of employees actually invited to participate in the Plan was by no measure qualitatively select. First, there is no evidence that these employees were "highly compensated" in either the relative or absolute sense of that term. Defendants argue that if we were to consider One-Hour Lab

36

employees, "the compensation levels of the employees to whom the Plan was

offered [would] range[] from two times to more than five times the compensation

paid to all other employees [of] CTC Corporation and its subsidiaries." Defs.-

Cross-Appellants' Br. at 23. Even setting aside the fact that there is no basis to

consider the One-Hour Labs' employees, Defendants cite no evidence to support

that assertion, which the district court found was "uncorroborated by CTC's

business records." *Browe I*, 331 F. Supp. 3d at 300. Defendants likewise do not

argue that this finding was clearly erroneous.

 To the contrary, the district court found, and Defendants do not contest,

that a significant number of the employees who were permitted to participate in

the Plan had annual salaries of $30,000 or less, and that some employees did not

even have salaried positions when they were invited to participate in the Plan (or

at any point thereafter). *See id.* at 284-88.

 Of course, companies vary greatly in size and profitability, and whether

the compensation paid to a group of participants tends to support the conclusion

that it is qualitatively select does not depend entirely on the absolute dollar

amount of those earnings. To qualify as "highly compensated," however, there

must at least be some evidence "of a substantial disparity between the

compensation paid to members of the [putative] top-hat group and the compensation paid to all other workers." *Alexander v. Brigham & Women's Physicians Org.*, 513 F.3d 37, 46 (1st Cir. 2008); *see also Demery*, 216 F.3d at 289 (group was select where, *inter alia*, "the average salary of plan participants was more than double that of the average [employee's] salary"). Here, however, the record is largely silent as to the overall compensation of CTC's employees. The evidence, moreover, showed a substantial disparity in earnings among Plan participants, who made anywhere from roughly $10,000 to over $100,000 annually, further tending to undermine the premise that they comprised a "select" group.

Second, consistent with their modest salaries, many participants in the plan had minimal managerial responsibilities, if they had any at all. Participants included Sharon Fish, whose responsibilities involved transporting and logging in products from CTC's Rutland facility to its Bennington facility; Hope Leonard, a print operator who never managed any employees; and William Elliott, whose responsibilities primarily consisted of maintaining and repairing the equipment used in CTC's business. Indeed, the district court found that a third of the employees invited to participate in the Plan were neither managerial nor highly

38

compensated. Defendants do not argue that this conclusion was unsupported as a matter of either fact or law, and we discern no basis in the record to upset it.

In other words, as the district court found, the evidence showed that employees were considered for participation at Laumeister's discretion, and that he "employ[ed] an array of criteria including whether an employee contributed to CTC's success, did not need to be 'coddled,' knew his or her job, had a nice home, and had a good reputation in the community." *Browe I*, 331 F. Supp. 3d at 301. Defendants do not meaningfully contest this finding, and there is ample evidence to support it. While the group meeting these idiosyncratic criteria might be "select" in some sense, it is not qualitatively select within the meaning of ERISA.

Finally, as we have previously observed, the "[a]bility to negotiate [plan terms] is an important component of top hat plans." *Demery*, 216 F.3d at 289. In this case, the record contains no evidence of even "a single CTC employee who negotiated any aspect of his or her Plan participation, nor . . . any evidence that CTC employees collectively had the bargaining power to negotiate the terms of the [] Plan." *Browe I*, 331 F. Supp. 3d at 301.

In sum, we agree with the district court that the Plan was not a top hat

plan. Considering the totality of the circumstances, including the significant

portion of the CTC workforce included; the broad range of compensation levels

among its participants, many of whom were not highly compensated; the

inclusion of a significant number of employees who lacked any indicia of

"management" status; the lack of coherent criteria for determining eligibility to

participate; and the inability of its participants to negotiate terms, we find no

error in the district court's conclusion that those circumstances cannot be

reconciled with ERISA's requirement that top hat plans be offered only to a

"select group of management or highly compensated employees." 29 U.S.C.

§ 1051(2). That is so irrespective of whether the employees who were invited to

participate comprised 30% of CTC's total workforce or approximately 10% of it.

## III.    Calculating the Restoration Award

Plaintiffs argue that the district court erred in limiting the restoration

award to the Plan's projected balance as of the end of 2004, when Laumeister

began using its assets to fund CTC's general operations. Plaintiffs are correct.

Section 409(a) of ERISA, codified at 29 U.S.C. § 1109(a), provides that

breaching fiduciaries "shall be personally liable to make good to such plan any

losses to the plan resulting from each such breach, and to restore to such plan any

40

profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." Under our precedent, this loss is calculated by comparing what the Plan actually earned following the fiduciary breach with "what the Plan would have earned had the funds been available for other Plan purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).

The district court's decision to limit the restoration award to the Plan's projected balance as of 2004 appears to flow from its conclusion that the Plan was, at that point, "terminated albeit without proper disclosures." *Browe II*, 2018 WL 5095677, at *6. But a termination that complies with neither the requirements of ERISA nor the terms of the operative plan itself is no termination at all. At a bare minimum, Laumeister could not terminate the Plan without first amending it to provide a date for its termination and, under the terms of the Plan (and ERISA), providing notice of that amendment to all participants. *See Frommert v. Conkright*, 433 F.3d 254, 263 (2d Cir. 2006) ("[A]n ERISA 'amendment' to a plan occurs only when the plan's employees are informed of a change in the text of the plan.").

Further, even setting aside any notices that might have been required,[13]

terminating the Plan as a matter of law would have immediately vested any and

all benefits accrued as of the date of termination in the Plan's participants

irrespective of whether they were otherwise vested under ERISA's vesting

schedules. *See, e.g., Matz v. Household Int'l Tax Reduction Inv. Plan*, 774 F.3d 1141,

1143 (7th Cir. 2014), citing 26 U.S.C. § 411(d)(3)(A); 26 C.F.R. § 1.401-6(b)(2).

Those vested benefits, and the remaining assets of the plan, would then have

been required to be distributed in accordance with the scheme set forth in 29

---

[13] Whether and to what extent termination of the Plan would have implicated ERISA's notice provisions would depend on its precise classification under ERISA. Although the parties agree that the Plan qualifies as an defined contribution plan within the meaning of ERISA, a stipulation that we see no reason to disturb, *see* 29 U.S.C. § 1002(34) (defining "defined contribution plan"), ERISA requires specific written notice as a precondition to effective termination for only certain types of defined contribution plans, *see, e.g.*, 29 U.S.C. § 1054(h) (requiring notice of termination for individual account plans subject to funding standards of 26 U.S.C. § 412 such as, *e.g.*, money purchase plans). *But cf. Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1071-73 (9th Cir. 2005) (fiduciary breaches duty by failing to notify participants of termination notwithstanding technical compliance with ERISA). However, because Laumeister and CTC did not provide any notice at all nor otherwise attempt to distribute Plan assets, we need not engage in such granular classifications to resolve the issues in this appeal and thus decline to do so. We note, however, that the district court erred insofar as it concluded that the Plan was subject to the notice requirements in 29 U.S.C. § 1426(e) which, by its terms, applies only to certain insolvent multiemployer plans. *See Browe II*, 2018 WL 5095677, at *12, citing 29 U.S.C. § 1426; *see also* 29 U.S.C. § 1002(37) (defining "multiemployer plan").

42

U.S.C. § 1344.[14] Although the district court chalked up Laumeister's failure to engage in any aspect of this process to his good-faith but mistaken belief that the Plan was a top hat plan, his actions were also inconsistent with that professed belief. Under the terms of the Plan, CTC was required to pay out each participant's benefits under one of three schedules following termination. In other words, neither ERISA nor the Plan permitted Laumeister to do what he actually did, *i.e.*, divert the Plan's assets to fund CTC's general operating expenses without so much as alerting participants.[15]

Accordingly, the district court's decision to limit the award to the amount that would have been in the Plan's account as of 2004 is irreconcilable with both

---

[14] Section 1344, by its terms, applies only to the termination of a "single-employer plan," which 29 U.S.C. § 1301(15) defines as, in relevant part, "any *defined benefit* plan (as defined in [29 U.S.C. § 1002(35)]) which is not a multiemployer plan." (Emphasis added); *see also* 29 U.S.C. § 1321(b)(1) (excepting "individual account plans" from provisions of Subchapter III of ERISA, including § 1344). However, 29 U.S.C. § 1103(d)(1) extends § 1344's applicability to any plan that is made subject to ERISA's fiduciary provisions by 29 U.S.C. § 1101. Section 1101, in turn, subjects to ERISA's fiduciary provisions all retirement plans other than top hat plans and plans providing payment to a retired partner or a deceased partner or a deceased partner's successor in interest as described in 26 U.S.C. § 736.

[15] If the Plan had been a top hat plan, participants would have had no recourse to challenge Laumeister's misappropriation of Plan assets under ERISA's fiduciary provisions. They would have been free, however, to pursue a remedy in contract.

the facts and the law. Had Laumeister effected a proper termination of the Plan, the Plan would have paid out all accrued benefits at the time of the termination; unless and until he paid those benefits, they would have remained in the Plan account held in trust for participants and their beneficiaries. Since Laumeister did *not* effectively terminate the Plan, the Plan funds likewise should have remained in the Plan's account earmarked for each participant until those participants (or their beneficiaries) could claim them at retirement age or upon the occurrence of other qualifying events. In either case, those funds would have been insulated from CTC's decline by virtue of their being held in trust and would have continued to generate returns until they were distributed. And though it is possible, perhaps even likely, that Defendants would have sought to terminate the Plan at some point between 2004 and this lawsuit had they become aware of the ramifications of their failure to do so, they did not; to limit liability on this basis would breach the cardinal rule that uncertainties in fixing damages are to be resolved against the breaching fiduciary. *See, e.g.*, *Donovan*, 754 F.2d at 1056 (collecting cases).[16]

---

[16] That rule long predates ERISA, and, for that matter, the founding of the United States of America. *See Armory v. Delamirie*, 93 Eng. Rep. 664 (1722) ("[U]nless the defendant . . . produce the jewel, and shew it not to be of the finest water, [the

For that reason, when substantial time has passed after an act of misappropriation, requiring the fiduciaries to restore to the plan only the amount that they took – which is, in effect, what the district court ordered – does not return the participants to the position that they would have occupied but for the breach, as required by ERISA. Nor does requiring breaching fiduciaries to restore all losses, including unrealized gains resulting from the breach, work a "penalty," as the district court suggested. Though Laumeister may have acted in good faith, the law must allocate the risk that his good-faith belief was mistaken. Restoring only the amount misappropriated effectively allocates that risk to the Plan and its participants, robbing them of future gains that they might have realized had their money remained prudently invested rather than being diverted to unprofitable ends (such as, in this case, the continued operation of CTC). ERISA, however, allocates that risk to Laumeister, by requiring him (subject to rights of contribution from other breaching co-fiduciaries) to "make good . . . *any losses . . . resulting from*" his breach. 29 U.S.C. § 1109(a) (emphasis added). We are not entitled to disregard that legislative judgment.

---

jury] should . . . make the value of the best jewels the measure of their damages.").

We therefore vacate the restoration award and direct the district court to recalculate it in order to capture losses through the date of judgment. On remand, the district court should presume that Plan funds "would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." *Donovan*, 754 F.2d at 1056. While Plaintiffs urge us to adopt the value proposed by their expert (whom the district court found credible), we believe the district court is better positioned to engage in this inquiry in the first instance and we remand the case to permit it to do so.

## IV. Liability for the Restoration Award

The district court declined to address CTC's liability for the restoration award and ordered Laumeister and Launderville to pay 60% and 40% of that award, respectively, directly to the Plan. Plaintiffs raise several objections to that award. First, Plaintiffs argue that the district court erred in declining to extend liability to CTC. Next, they contend that Laumeister's liability is joint and several, and thus, even if other fiduciaries are also liable, his liability cannot be capped at 60% of the total award. Finally, they argue that Launderville is not liable in

46

contribution at all and that, to the extent that she is liable, that liability is to

Laumeister, not the Plan itself.

Plaintiffs are correct that the district court should have assessed CTC's

liability, if any, for the claims asserted against it. They are also correct that

liability under ERISA is joint and several; as such, there is no basis to cap

Laumeister's liability at only 60% of the total award. Finally, while we affirm the

district court's conclusion that Launderville is liable for contribution as a co-

fiduciary, we agree that the district court erred in holding Launderville directly

liable to the Plan. We therefore remand for the district court to assess CTC's

liability, if any, and the extent of Launderville's liability to Laumeister.[17]

A.    *CTC's Liability*

Plaintiffs sued both Laumeister and CTC, seeking to hold both jointly and

severally liable for any award. J. App'x at 66-77. The district court, however, did

not address CTC's liability in either its merits or remedial opinions. While it is

not entirely clear to us what Plaintiffs seek to gain from pursuing a judgment

---

[17] We note that both Laumeister and CTC sought contribution from Launderville. Because the district court did not determine CTC's liability, we have no occasion to decide whether CTC is entitled to contribution from Launderville; the district court may consider that issue on remand if necessary.

against a defunct corporation, they are entitled to judgment on each of their

claims with respect to each named defendant. We therefore direct the district

court on remand to assess CTC's liability, if any, as to each of Plaintiffs' claims

against it.

      B.    *Laumeister's Liability*

     As discussed, the district court held Laumeister liable for 60% of the

restoration award, payable directly to the Plan, separate and apart from the

liability it assessed against Launderville. That was error.

     Although the district court recognized that we have held that ERISA

permits suits among co-fiduciaries for contribution, its 60/40 allocation of several

liability is in conflict with a fundamental rule from which that holding flows:

"Under ERISA, breaching fiduciaries are jointly and severally liable." *In re*

*Masters Mates & Pilots Pension Plan & IRAP Litg.*, 957 F.2d 1020, 1023 (2d Cir.

1992). Indeed, were liability under ERISA apportioned among fiduciaries

according to their relative responsibility for the loss, there would be no need to

recognize the right of contribution, as no single co-fiduciary would be required to

pay damages in excess of his proportionate share of fault. Accordingly,

Laumeister bears liability for the full amount of the Plan's losses, jointly and

severally with any other Defendants found liable. Plaintiffs are entitled to seek full satisfaction of the judgment from Laumeister, subject to Laumeister's right to seek contribution from Launderville, as discussed below.

### C. Launderville's Liability

Plaintiffs challenge the district court's assessment of Launderville's liability, arguing that the district court's findings of fact are insufficient to support it. Plaintiffs further argue that the district court erred in holding Launderville liable directly to the Plan because, in their view, to the extent that Launderville is liable at all, she is liable only to Laumeister. While we disagree with Plaintiffs on the underlying question of Launderville's liability, we agree that there is no basis to hold her directly liable to the Plan and vacate the judgment as against her accordingly. On remand, the district court should assess the extent of Launderville's liability to Laumeister, taking into consideration, as necessary, the recalculated restoration award. We also reverse the district court's determination to hold Launderville liable for violation of ERISA's reporting requirements, as no claim was brought against her for that failure.

ERISA provides that a fiduciary is vicariously liable for the acts of his co-fiduciary where, *inter alia*, "he has knowledge of a breach by such other fiduciary,

unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a)(3). Separately, we held in *Chemung Canal Trust Co. v. Sovran Bank/Maryland* that the federal courts are authorized to develop a federal common-law under ERISA concerning the allocation of liability among co-fiduciaries with reference to traditional principles of trust law. 939 F.2d 12, 16-18 (2d Cir. 1991).

Plaintiffs' argument that Launderville shares no blame for Laumeister's misappropriation of Plan assets rests on the district court's finding that Laumeister had sole control over those assets. Be that as it may, the district court also found that, after learning of Laumeister's breach, Launderville neither notified other participants of Laumeister's efforts to use Plan assets to fund CTC's operating shortfalls nor endeavored to take any steps to prevent him from doing so. To the contrary, Launderville advised Laumeister of the extent of the shortfalls, knowing that Laumeister would then direct that Plan assets be used to cover them. That use of Plan assets directly benefitted Launderville – she had a lucrative position at CTC, and it was in her interest for the company to remain afloat so that she could continue to collect her salary. Moreover, while she was furthering Laumeister's use of Plan assets to prop up CTC, Launderville was also

50

working to secure her own interests, cutting a side deal with Laumeister to ensure that she received compensation from his estate in lieu of what she would have received through the Plan, while taking no steps to notify the other Plan participants of Laumeister's actions, or otherwise to protect their interests.

We agree with the district court that these facts are more than adequate to support the conclusion that Launderville was sufficiently culpable to support an assessment of liability against her. *See Browe II*, 2018 WL 5095677, at \*11-12. Not only did she take no steps to remedy Laumeister's breach, which is sufficient to impose co-fiduciary liability, but she also engaged in classic self dealing, affirmatively furthering that breach in violation of her own fiduciary duties so as to secure a continuing benefit for herself. *Cf. Restatement (Second) of Trusts* § 258(1)(b) (providing for contribution among co-fiduciaries "if one of them receives a benefit from the breach of trust"). Though she may be *less* culpable than Laumeister, we cannot say on this record that she should escape liability entirely.

However, the district court erred in holding Launderville directly liable to the Plan. Although Plaintiffs had the option to sue Launderville in lieu of or in addition to Laumeister (in which case she would have been liable to the Plan,

51

alone or jointly and severally, for the entirety of the restoration award, subject to her right to seek contribution from Laumeister), Plaintiffs instead sought to recover from Laumeister who, in turn, sought contribution from Launderville. Laumeister did not, however, bring his counterclaim against Launderville on behalf of the Plan, nor did he seek to recover on behalf of the Plan for injuries to it.[18] Consequently, there is no basis to hold Launderville liable directly to the Plan; she is liable only to the party who sued her.

As to the extent of that liability, the district court assessed Launderville's liability at 40% of the restoration award. Because we have ordered the district court to recalculate the restoration award, the district court may choose to revisit the allocation issue. We therefore do not consider whether the district court appropriately apportioned fault between Launderville and Laumeister, and we express no view on that issue.

Finally, we vacate the $1,000 judgment against Launderville for failure to

---

[18] Even if Laumeister had styled his counterclaim as seeking such relief, it is questionable whether he would have standing to pursue relief on behalf of the Plan given that he has consistently taken the position that the Plan no longer exists. *See Chemung*, 939 F.2d at 14 ("[ERISA] names only three classes of persons who may commence an action [for fiduciary breaches], and a former fiduciary is not one of them.").

comply with ERISA's reporting provisions. While the district court's findings of fact may well be sufficient to have supported such liability for Launderville in her capacity as a Plan administrator had anyone sought such a remedy against her, the district court had no power to impose such a penalty sua sponte. ERISA entitles only Plan participants and their beneficiaries to privately enforce ERISA's reporting requirements, and no participant or beneficiary sued Launderville under that provision. *See* 29 U.S.C. § 1132(a)(4). Further, though Laumeister's counterclaim sought contribution from Launderville "to the extent[] that Defendants . . . are found liable on account of any of the claims of Plaintiffs alleged in the Complaint," J. App'x at 103, none of the allegations in that counterclaim referenced ERISA's reporting requirements or her failure to comply with them. *Cf. Port Dock & Stone Corp. v. Oldcastle N.E., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (a complaint's "factual allegations must be enough to give the defendant fair notice of what the claim is and the grounds upon which it rests"), citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And we have never held that contribution is available for ERISA claims other than those for fiduciary breaches. Accordingly, we vacate the judgment of $1,000 against Launderville for failure to comply with ERISA's reporting requirements.

53

V.      **Distributing the Restoration Award**

The district court entered judgment for Defendants on Plaintiffs' wrongful denial of benefits claims and, having concluded that no Plaintiff had demonstrated his or her entitlement to benefits under the terms of the Plan, ordered the award distributed on a per capita basis to all participants to, *inter alia*, "reflect a recovery on behalf of the Plan as a whole as opposed to individual Plan Participants." *Browe II*, 2018 WL 5095677, at *7. Plaintiffs contend that the district court erred in granting judgment for Defendants on Plaintiffs' claims of wrongful denial of benefits because the evidence establishes that their rights under the Plan were vested and enforceable, and that the per capita distribution scheme adopted by the district court violates those vested rights.

We agree with Plaintiffs, at least in part. Although we do not hold that Plaintiffs have established their entitlement to benefits – as Defendants may have viable defenses to those claims – we conclude that the district court erred in its conclusion that they had failed to establish their entitlement as a matter of law. We further agree with Plaintiffs that the district court's per capita distribution scheme risks violating the vested rights of Plaintiffs and other participants and is, in any case, inconsistent with ERISA. We address each issue in turn below.

A.      *Wrongful Denial of Benefits Claims*

ERISA provides that "[a] civil action may be brought by a participant or

beneficiary . . . to recover benefits due to him under the terms of his plan, to

enforce his rights under the terms of the plan, or to clarify his rights to future

benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). "[T]he validity

of a claim to benefits under an ERISA plan is likely to turn on the interpretation

of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115 (1989).

The district court entered judgment for Defendants on Plaintiffs' wrongful

denial of benefits claims because, in its view, Plaintiffs "ha[d] [not] satisfied the

conditions precedent to payments [under the Plan]. They [did] not retire[] at

sixty-five, die[], or become disabled while in CTC's employment and they [did]

not proffer[] evidence that they complied with the 1997 Plan's 3% contribution

requirement to an IRA." *Browe I*, 331 F. Supp. 3d at 304. On review, however, we

are not persuaded that the district court's conclusions are consistent with ERISA.

While we do not hold that Plaintiffs have established their entitlement to benefits

as a matter of law, the district court's decision cannot stand on its own terms and

we therefore vacate the judgment on these counts and remand to the district

court for further proceedings.

Beginning with the issue of "retirement," the 1990 and 1997 Plan Agreements both provide that the Plan will begin paying benefits upon, among other events, the "Retirement of the Participant." J. App'x at 375, 379. Both plans define "Retirement" as "withdrawal from full time active employment at or after age 65." *Id.* at 374, 378. The district court, based on the testimony about the parties' understanding at the time the plan was drafted, construed this to signify "retirement at CTC." *Browe I*, 331 F. Supp. 3d at 304.[19]

Though it may be the case that this construction of the term "retirement" best conforms with Laumeister's intentions and the participants' contemporaneous understanding, it cannot be squared "with the well-established idea that contracts necessarily incorporate the law as it stands at the time of contract formation." *Sullivan v. Nassau County Interim Fin. Auth.*, 959 F.3d 54, 62

---

[19] The district court also appeared to construe the Plan documents' provision for the payment of benefits "when a Participant dies before Deferred Compensation payments start," J. App'x at 375, 379, to embrace only employees who died while employed by CTC. *Browe I*, 331 F. Supp. 3d at 304 ("Tyler Burgess's and Bonnie Jamieson's claim to benefits under the 1997 Plan depends on their mother's status at the time of her death both in terms of whether she was a Plan participant and whether she was employed by CTC at the time of her death."). That interpretation also fails for the reasons discussed in this section.

(2d Cir. 2020); *see also Browe II*, 2018 WL 5095677, at *6 ("[C]ourts must interpret plans to adhere to ERISA requirements.") (alteration omitted). ERISA provides that a participant's benefits under a covered plan vest upon the earlier of her attainment of normal retirement age (as defined in 29 U.S.C. § 1002(24)) or her completion of a specified number of years of service. *See* 29 U.S.C. § 1053. Once benefits vest, they are nonforfeitable, even if their receipt must await the occurrence of future events such as retirement or death. That is so even if the employee has "consent[ed] to plan provisions that would otherwise require forfeiture." *Heinz v. Central Laborers' Pension Fund*, 303 F.3d 802, 804 (7th Cir. 2002).

The district court thus erred in construing the term "retirement" to signify retirement from CTC and entering judgment for Defendants on Plaintiffs' wrongful denial of benefits claims insofar as that decision was premised on the notion that Plaintiffs lost any claim to benefits by leaving CTC prior to reaching retirement age. If Plaintiffs had vested benefits which, as discussed below, appears to be the case, they are entitled to those benefits upon their retirement irrespective of their employer at that time.

That, however, was not the only reason why the district court found

57

Plaintiffs' wrongful denial of benefits claims lacking; as discussed above, the

court also found that Plaintiffs failed to prove that they had deposited at least 3%

of their income into an IRA as required by the Plan. In other words, the district

court found that Plaintiffs never even participated in the Plan to begin with. It is

not clear, however, that the Plan provision sweeps that broadly; we therefore

cannot affirm the judgment on that alternate basis.

Of course, a party seeking to recover for wrongful denial of benefits under

ERISA bears the burden of proving her entitlement to those benefits. *See, e.g.*,

*Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287-88 (2d Cir. 2000). But

whether a party is entitled to benefits under a Plan will depend on the terms of

the plan at issue. *See, e.g.*, *Bruch*, 489 U.S. at 115. And while both Plan Agreements

contain provisions requiring employees to present evidence of having

contributed 3% of their income to an IRA, we are less confident than the district

court that Plaintiffs' failure to adduce evidence of their own contributions is fatal

to their claims.

As an initial matter, we reject Plaintiffs' contention that CTC's failure to

provide Plan participants with a summary plan description ("SPD") setting forth

the requirement of 3% contributions precludes Defendants from relying upon or

enforcing it. In order to succeed on this theory, Plaintiffs are required to show that they were "likely to have been harmed as a result of a deficient SPD." *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 585 (2d Cir. 2006) (emphasis omitted); *see also Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 171 (2d Cir. 2005) ("[A]n ERISA claim premised on the complete absence of an SPD also requires a showing of likely prejudice."). Here, however, the record makes clear that Plaintiffs were separately informed of the 3% requirement through their application to participate in the Plan. *Wilkins*, 445 F.3d at 585 (deficient SPD is harmless if "employee independently knew the information that was wrongfully omitted from the SPD").[20]

That, however, does not settle the matter. Although the 1990 Plan Agreement required participants to "agree to provide evidence," J. App'x at 375, of contributions to their IRA, it sets forth no consequences for their failure to do so. The district court evidently construed the 3% contribution as a condition precedent to the accrual of benefits. But "conditions precedent . . . are not favored

---

[20] Although it is unclear from the record whether that information was also contained on the application to participate under the 1990 Plan Agreement (if any such application existed), because Plaintiffs bear the burden of showing likely prejudice, that failure of proof works to their detriment.

and must be expressed in plain, unambiguous language." *Georges v. United Nations*, 834 F.3d 88, 94 (2d Cir. 2016). The 1990 Plan documents contain no such language. And the record demonstrates CTC itself was evidently not particularly bothered by the apparent lack of clarity; it continued to deposit deferred compensation earmarked for each participant in the Plan account and took no steps to verify compliance with the 3% contribution requirement, suggesting that, even if the requirement were intended as a condition, CTC was content to waive it.[21] And under the terms of the 1990 Plan Agreement, CTC's contributions were to "*accrue* and be payable." J. App'x at 375 (emphasis added). That provision, considered together with the absence of language expressly conditioning participation on IRA contributions or expressly providing for forfeiture of accrued unvested benefits in the event that any participant stops making

---

[21] We note also that, although Laumeister testified that "without notification by the employee of stopping paying the three percent, [CTC] would have no way of knowing [that employees were failing to make contributions]," Dist. Ct. Dkt. 195 at 32:8-9, the 1990 and 1997 Plan Agreements require the presentation of evidence of such contributions to CTC, and ERISA requires employers to "maintain records with respect to each of [their] employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1). CTC's admitted failure to keep such documentation further supports the conclusion that it waived the contribution requirement and counsels against permitting it to invoke that requirement to avoid paying Plan benefits.

contributions, and the absence of a no-waiver clause, counsel against reading the provision as imposing a condition precedent to participation.[22]

Although the 1997 Plan Agreement is largely identical to the 1990 Plan Agreement, it supplements the contribution requirement by providing that "[i]n the event that a Participant fails to continue funding the IRA . . . the Employer will terminate funding the plan on behalf of the Participant and all benefits accrued will be forfeited to the Employer. The Employer will notify the Participant in writing thirty days prior to termination." *Id.* at 379. While that language may appropriately be construed as a condition, there remain obstacles to its enforcement in this case.

Most notably, to the extent that the contribution requirement imposes a condition upon participants as a precondition to continued employer contributions, it likewise requires the employer to provide notice of its intent to

---

[22] Moreover, we observe that at least one Plaintiff, Phil Jordan, specifically testified that he had an IRA and that he stopped contributing 3% of his salary to that IRA only sometime between 2002 and 2004. Assuming that this testimony is credited (and the district court did not find otherwise), at most, that failure would preclude Jordan from accruing *additional* benefits after he stopped making such contributions; it could not effect a forfeiture of benefits that had already vested. Moreover, as noted, Plaintiffs no longer seek to recover the value of contributions made after March 1997, up to which point, according to Jordan, he had been contributing 3% of his income to an IRA.

terminate those contributions. But there is no evidence in the record that any such notice was provided; to the contrary, Laumeister testified that he was not aware of any such notices being sent, and Jordan testified that he had never received one.

Accordingly, we cannot sustain the district court's conclusion that Plaintiffs' failure to prove that they made IRA contributions renders them ineligible for Plan benefits. We therefore vacate the judgment entered for Defendants on Plaintiffs' wrongful denial of benefits claims. We express no view on the viability of Defendants' remaining defenses to these claims, which are appropriately addressed by the district court in the first instance.

B.    *The Distribution Scheme*

The district court, citing uncertainties in calculating individualized benefits with specificity, ordered that the restoration award be distributed to Plan participants who met certain years-of-service eligibility criteria on a per capita basis. While we are cognizant of the difficulties inherent in crafting and administering an award in unusual cases such as this, in which most relevant records have been destroyed and memories have faded considerably, the district court's distribution scheme is both inconsistent with ERISA and risks violating

the vested rights of Plan participants. We therefore vacate that portion of the judgment.

As the district court observed, the remedies available under ERISA for fiduciary breaches are intended to provide relief to the subject plan as a whole, as opposed to any individual participant (or her beneficiary). *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140-42 & n.9 (1985). Accordingly, the basis for the district court's authority to order a further distribution of that award to Plaintiffs or the remaining Plan participants, absent proof of entitlement to Plan benefits, is not clear to us, and we discern nothing in ERISA's remedial provisions authorizing such relief. *Cf. Halo v. Yale Health Plan*, 819 F.3d 42, 59 (2d Cir. 2016) ("[T]he federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide."), quoting *Russell*, 473 U.S. at 145. The particular distribution scheme selected by the district court, moreover, is inconsistent with the district court's own finding that no Plaintiff had made the requisite IRA contributions and its conclusion that they had not established that they were wrongly denied Plan benefits to which they were entitled. Though we have vacated the judgment on those counts for the reasons discussed in the preceding section, under the district court's own logic, Plaintiffs

63

should not have received any portion of the restoration award. In other words, the sole purpose of the restoration award should have been to make the Plan whole so that benefits could be distributed to those participants to whom they were due.

Further, assuming that some or all Plaintiffs have accrued benefits, which the record suggests may be the case, we are puzzled by the district court's conclusion that Plaintiffs "introduced no testimony or other evidence regarding the extent to which they were vested in the Plan." *Browe II*, 2018 WL 5095677, at *7. As the district court itself recognized, under ERISA's minimum vesting schedules, a defined contribution plan participant's accrued benefits fully vest upon the completion of three or six years of full-time service[23] excluding, *inter alia*, any years of service during which the employer did not offer the plan or a predecessor plan. *See* 29 U.S.C. §§ 1053(a)(2)(B), 1053(b)(1)(C). Given that the Plan was offered beginning in 1990 at the latest, the district court's own findings of fact confirm that all Plaintiffs' accrued benefits had fully vested irrespective of

---

[23] Whether benefits vest after three or six years of service depends on whether the plan in question provides for "cliff vesting," which provides for complete vesting upon three years of service, or graduated vesting, which provides that an employee's benefits vest by 20% each year beginning at the end of the second year of service.

which vesting schedule applied, as each of them (or, in the case of Jamieson and

Burgess, their mother) completed well over six years of full-time service with

CTC after 1990. *See Browe I*, 331 F. Supp. 3d at 268-69.

For that reason, Plaintiffs are correct that the per capita distribution scheme

violates – or at least risks violating – their vested rights. Equally importantly,

even assuming that no Plaintiff was entitled to benefits, the per capita

distribution scheme ordered by the district court risks violating the vested rights

of other participants in the Plan not parties to this suit, whose benefits may well

exceed the amount that they would receive were the Plan's assets distributed per

capita. We therefore vacate the judgment insofar as it ordered per capita

distribution and remand for the district court to craft a remedial scheme that

takes into account the vested rights of participants after conducting, to the extent

necessary, any additional fact-finding. That remedial scheme should include a

mechanism enabling Plan participants not parties to this suit to receive any

benefits to which they may be entitled, similar to that adopted by the district

court in the first instance. The district court should also provide for an

appropriate disposition of excess funds, if any, remaining after claims have been

paid out. *See generally Bennett v. Conrail Matched Savings Plan Admin. Comm.*, 168

F.3d 671 (3d Cir. 1999) (discussing distribution of surplus funds in ERISA plan).

## VI. Admission of Plaintiffs' Exhibit 3

Finally, Defendants contend that the district court erred in admitting

Plaintiffs' Exhibit 3, a summary chart prepared by Wayne Massari in or around

1997 showing then-current Plan balances and projected payouts for participants.

"We review a district court's rulings on the admissibility of trial evidence for

abuse of discretion." *United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014).

"Further, the admission of evidence in a bench trial is rarely ground for reversal,

for the trial judge is presumed to be able to exclude improper inferences from his

or her own decisional analysis." *BIC Corp. v. Far Eastern Source Corp.*, 23 F. App'x

36, 39 (2d Cir. 2001) (collecting cases). We discern no such abuse here.

Defendants spend a considerable portion of their briefing arguing that

Exhibit 3 was inadmissible as a business record under Federal Rule of Evidence

803(6) because Launderville's testimony did not supply an adequate foundation

and because, as the district court recognized, the document contained certain

assumptions (such as a 15-year payout schedule) that were inconsistent with the

terms of the Plan. Assuming, *arguendo*, that Defendants are correct about Rule

803(6) – and we have serious doubts that this is the case – the dispute is an

academic one. The district court held that Exhibit 3 was admissible both as a

business record and as an admission of a party-opponent under Rule

801(d)(2)(D). And because Defendants do not argue that district court's

admission of Exhibit 3 as a statement of a party opponent was error,[24] we need

not consider whether it was properly admitted as either a business record or an

opposing party's statement. *See, e.g.*, *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao*

*People's Democratic Republic*, 864 F.3d 172, 190 (2d Cir. 2017); *see also Green v.*

*Mazzucca*, 377 F.3d 182, 183 (2d Cir. 2004) ("[W]hen a judgment rests on two

independent grounds, a failure to appeal either one of them justifies summary

affirmance.").

 In any case, the district court's ruling that Exhibit 3 was admissible as an

opposing party's statement under Rule 801(d)(2)(D) was not error. Rule

801(d)(2)(D) defines as nonhearsay any statement offered against a party made

"by the party's agent or employee on a matter within the scope of that

relationship while it existed." Fed. R. Evid. 801(d)(2)(D). A party seeking to admit

such a statement must establish "(1) the existence of the agency relationship,

---

[24] Though, puzzlingly, they contend that Exhibit 3 was not admissible as a statement against interest under Rule 804(3), a rule on which the district court did *not* rely in admitting it.

(2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 129 (2d Cir. 2005) (internal quotation marks omitted). Defendants acknowledge that Massari was CTC's Treasurer and Chief Financial Officer, and that administering the Plan was within the scope of his duties. While Defendants (in arguing that it was not a business record) claim that "it is improbable that Trial Exhibit 3 was produced by Mr. Massari or provided by Mr. Massari to Ms. Launderville," Defs.-Cross-Appellants' Br. at 39, the district court explicitly credited Launderville's testimony on that point. *See Browe I*, 331 F. Supp. 3d at 278 ("Ms. Launderville credibly testified that she was given the undated worksheet identified as Plaintiffs' Exhibit 3 by Mr. Massari."). We must defer to the district court's credibility assessment absent a showing of clear error; no such showing has been made here.[25] Accordingly, the record supports the conclusion that all the requirements of Rule 801(d)(2)(D) are satisfied. The district court's admission of the exhibit pursuant to that rule was thus well within its

_____

[25] The district court further held Exhibit 3 admissible under Federal Rule of Evidence 807(a)'s residual hearsay exception. In view of Defendants' failure to argue that the exhibit was not properly admitted as a party-opponent's statement, we do not consider that alternate basis.

discretion.

## CONCLUSION

"ERISA is, of necessity, a highly complex and detailed statute." *Jankowski v. Int'l Brotherhood of Teamsters Local No. 710 Pension Fund*, 673 F.2d 931, 936 (7th Cir. 1982), *vac'd*, 463 U.S. 1222 (1983). Unsurprisingly, ERISA litigation often presents novel and difficult legal issues. This case is no exception, and the difficulty of adjudicating those issues is further compounded by the significant amount of time that has passed since the underlying events occurred, during which relevant records were lost or destroyed and memories faded. We are cognizant of the difficult task that confronted the district court in resolving this case, and we acknowledge its careful and diligent work.

Nonetheless, on review, we are constrained to conclude that the district court erred with respect to several issues. Accordingly, and for the reasons discussed above, we AFFIRM IN PART and REVERSE IN PART the judgment of the district court and REMAND this case for further proceedings consistent with this opinion. We further DENY all pending motions as moot.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit